## Case No. 133.

### ALBANY EXCH. BANK v. JOHNSON.

[5 Law Rep. 313.]

District Court, N. D. New York. July, 1842.

INVOLUNTARY BANKRUPTCY—PETITION BY CORPORATION—VERIFICATION.

1. The president, cashier, treasurer, or other officers of a corporation, who undertake to make proof of debts due to the corporation, in accordance with the fifth section of the bankrupt act, must receive a special appointment for that purpose.

2. Whether a petition in invitum, in behalf of a corporation, can properly be received without proof that the persons by whom it is signed and verified are in fact the authorized agents of the corporation,—quaere.

3. By the terms of the fourteenth section of the bankrupt act, partners in trade cannot be decreed bankrupts in invitum, on the ground of insolvency alone.

4. Under the circumstances of this case, it was held, that no act of bankruptcy had been committed by the parties petitioned against.

[Cited in Re Bonnet, Case No. 1,632; Ashby v. Steere, Id. 576.]

In bankruptcy. This was a petition by the Albany Exchange Bank that Ralph Johnson and Benjamin P. Watrous be decreed bankrupts. The petition alleged that the debtors were merchants, doing business as such in the city of Albany, and composing the firm of Johnson & Watrous, and contained the usual allegations as to their indebtedness. It charged them with having, on the twenty-seventh day of April last, fraudulently executed a bond in the penalty of $12,000, conditioned for the payment of $10,000, together with a warrant of attorney to confess judgment thereon, to Andrew J. Johnson, Anthony Ten Eyck and Robert Johnson, on which bond and warrant of attorney a judgment was entered up in the supreme court of the state for $12,000 besides costs, on the third of May last; and also with having on the same day fraudulently executed another bond in the penalty of $3,000, conditioned for the payment of $2,000, together with a warrant of attorney, in favor of Andrew Watrous, on which a judgment was also entered up on the third day of May last, for $3,000, besides costs. The petition further alleged that writs of fieri facias were issued on each of these judgments on the twenty-seventh of May last, in virtue of which writs the sheriff had sold the goods and stock in trade of said R. Johnson and B. P. Watrous; that as the petitioners are informed and believe, at the time of the execution of the said bonds and warrants, the said Johnson & Watrous were, ever since have been, and still are, insolvent, and that, as the petitioners believe, the said bond and

warrants were executed for the express purpose of securing to the obligees therein named the payment of their claims, and of giving them a preference over the general creditors of the said Ralph Johnson and Benjamin P. Watrous. On the day appointed to show cause, the alleged bankrupts and the judgment creditors above named appeared by their counsel to oppose the granting of a decree of bankruptcy, and put in their answers and objections to the petition under oath. The facts and circumstances relative to the judgments and executions complained of in the petition, as detailed in these answers and the explanatory affidavit of Mr. Ferguson, the attorney for the judgment creditors, were substantially as follows: Prior to and on the twelfth of March last, the alleged bankrupts Johnson & Watrous were retail merchants in good credit, and were solvent or fully believed themselves to be so. The above named Andrew J. Johnson, A. Ten Eyck and Robert Johnson were their indorsers, and Andrew Watrous was also their indorser or acceptor. A short time previous to the twelfth of March last, the alleged bankrupts applied to the said A. J. Johnson, Ten Eyck, and R. Johnson, to continue and also to increase their responsibilities as indorsers, and this "they consented to do provided the said Johnson & Watrous would give them some kind of security as indemnity against 'unforeseen accidents or revulsions in business." The latter therefore executed to the former, on the twelfth of March last, a bond and warrant of attorney the penalty of which bond was $12,000, and which was conditioned for the payment of $10,300. This bond and warrant were designed for the security as well of Andrew Watrous above named, as of the persons therein named, this being expressly understood and at the time of the execution of the bond and warrant. At that time the alleged bankrupts were considered by all parties concerned, and believed themselves to be, perfectly solvent. It was not intended to enter up any judgment on the bond and warrant, unless at some future time there should unexpectedly appear to be a reason for so doing. But on the twenty-seventh of April, in pursuance of the request of Andrew Watrous, and for the sole purpose, as he stated, of giving him a separate, independent security, the alleged bankrupts executed to him the bond and warrant mentioned in the petition and at the same time executed to Andrew J. Johnson and others the other bond and warrant mentioned in the petition, on which judgments were entered on the third of May and execution subsequently issued. The alleged bankrupts expressly averred that at the time these bonds and warrants were executed they believed themselves, and the obligees in the bonds averred that they believed them to be solvent; and the alleged bankrupts denied that they were executed in contemplation of bankruptcy. Their subsequent failure or apprehension of failure which induced the entry of judgment on the bonds and warrants arose from the failure of one Oliver De Goff to whom they had loaned their notes, for whom they were responsible as indorsers, and in whose solvency they had full confidence until the time of his failure.

Gould, for petitioning creditor.
J. Hammond, for respondents.

CONKLING, District Judge. One of the objections urged at the bar to a decree of bankruptcy in this case is, the want of any sufficient evidence that the two persons who signed the petition, and by whom the debt due to the petitioners was proved, had authority thus to act. To the name of one of them the abbreviation "Cash'r." and to the name of the other the abbreviation "Pres't," is added; and in the jurat of the commissioner, they are respectively denominated the president and the cashier of the Albany Exchange Bank. The fifth section of the bankrupt act provides that "corporations to whom any debts are due may make proof thereof by their president, cashier, treasurer, or other officer, who may be specially appointed for that purpose;" and by one of the rules of the court, petitioning creditors are required to prove their debt before presenting their petition. If, as I think is the case, the qualification "who may be specially appointed," etc. applies as well to the officers named, as to any "other officer" who may undertake to act in behalf of a corporation, it would seem to follow that for the purpose of proving a debt to a corporation, by the oath of one of its officers such officer must receive a special appointment for that purpose. Indeed, independently of the above recited provision of the act. it may well be doubted whether a petition of this nature in behalf of a corporation, could properly be received without proof that the persons by whom it was signed and verified were in fact the official organs or the authorized agents of the corporation. But as this objection was overlooked at the time the rule to show cause was granted, and as at this stage of the proceeding the petitioning creditors ought probably, at any rate, to be allowed to supply the deficiency, I deem it proper, in this instance, to pass over the objection and proceed to a brief examination of the merits of the case.

It is well known that a very large proportion of the commercial and mercantile business of this country is carried on by means of mutual credit, and it cannot, I think, be conceded that a solvent merchant may not lawfully give security in any of the accustomed forms, in good faith, to another, as the condition on which he is from time to time to receive a loan of the credit of the latter, and for the purpose of securing him in anticipation against the vicissitudes of

trade. It is true the practice of giving such security, especially by bond and warrant of attorney, may lead to consequences which it is the policy of bankrupt laws, as far as is consistent with the general interests of trade, to prevent. But such security given to an indorser, is no more obnoxious to this objection than the like security would be if given to secure the payment of money borrowed to be employed in trade. If, therefore, the indorsers in this case, instead of taking the separate bonds and warrants executed on the twenty-seventh of April, as a substitute for the bond and warrant executed on the twelfth of March, had contented themselves with this original security, which there is no just pretence for supposing to have been given in contemplation of bankruptcy, or for the purpose (within the meaning of the first section of the bankrupt act) of willingly or fraudulently procuring the goods of the obligors to be taken in execution, I should not have hesitated to decide that no act of bankruptcy had been committed. The change of security was undoubtedly a hazardous experiment, and the fact that the new bonds and warrants were for a larger sum than that for which the original security was given, is a circumstance which increases the difficulty of the case. But it is to be considered that neither the bond and warrant of the twelfth of March, nor the two bonds and warrants of the twenty-seventh of April, were given to secure any specific or ascertained amount, but only for the purpose of indemnity against contingent liabilities. The motive, if there was any, for thus increasing the amount does not appear, and it seems reasonable to suppose that it was the effect of inadvertence or caprice on the part of the person who was employed to draw the new securities; for when executions came subsequently to be issued, the aggregate amount which the plaintiffs claimed a right to levy, fell short of the amount of the original bond. Upon the whole, therefore, I cannot take it upon myself to decide that the substitution of the securities of the twenty-seventh of April, for the security of the twelfth of March, changed the legal predicament of these debtors, under the bankrupt act. This case differs essentially from that of the Messrs. Loomis, decided last week. In that case the bond and warrant were executed for the avowed purpose of giving a preference to indorsers, for liabilities already incurred, under the apprehension of impending bankruptcy. Perhaps in that case too much importance was ascribed to the fact that execution was immediately sued out, when by a late statute of this state executions are not permitted to be issued until after the expiration of thirty days from the entry of the judgment. On the argument of that cause, I inquired of the counsel whether the act was applicable to judgments confessed under a warrant of attorney containing the usual release of all errors in the judgment and in the issuing of execution. The answer of the counsel for the petitioning creditors was in the affirmative; and this answer was acquiesced in by the counsel for the debtors, and was corroborated by the opinion of a highly intelligent gentleman of the profession whom I subsequently consulted. On the argument of the present case, however, its correctness was denied. The question does not appear to have arisen in the state courts, and I doubt whether as between the judgment debtor and creditor, the former would be entitled to any relief against an execution issued within the thirty days upon a judgment thus confessed; although as between a judgment creditor of this description and another judgment creditor who had obtained his judgment by the ordinary mode of adverse process, a different rule ought perhaps to prevail. If this be so, the suing out of executions, and the seizure of the debtor's goods a few days before the expiration of the thirty days without resistance on their part, was an unimportant circumstance. My conclusion is, 1. That in the giving of the securities in question in this case, there was no actual fraud: 2. That they cannot be considered as having been voluntarily given in contemplation of bankruptcy for the purpose of giving an unlawful preference; and, 3. That these debtors are not chargeable with having "fraudulently or willingly procured their goods, &c. to be taken in execution."

It remains to inquire whether they are liable to be declared bankrupts in virtue of the fourteenth section of the act. It is very clear that the petition was not drawn with a view to this section, and that the allegation that the debtors are insolvent, was introduced only for the purpose of giving character to the alleged acts of bankruptcy. The argument of the counsel for the objectors, that the debtors ought not upon this petition to be called upon to meet this allegation, therefore, was not without plausibility and weight. But I propose for the present to pass by this objection, and to consider the petition, taken in connexion with the admissions of the objectors, as sufficient to raise the question whether partners in trade can be declared bankrupts on the petition of a creditor, on the ground of insolvency alone. It must be admitted that such seems to be the literal import of the language of the fourteenth section. It declares "that when two or more persons, who are partners in trade, become insolvent, an order may be made in the manner provided in this act, either on the petition of such partners, or any one of them, or on the petition of any creditor of the partners; upon which order all the joint stock," etc. The question whether this enactment is to receive a literal interpretation with respect to the point now before the court, it will be perceived at a glance, is one of very great importance: for if the provision is to be so in-

terpreted, it will introduce a principle of great comprehension and stringency, which has not hitherto found a place in the bankrupt laws of England, and which had no place in the American act of 1800. Its practical operation would unquestionably be very severe, and it is to be feared, in many instances, unjust. So far as mercantile partnerships are concerned, it would subvert the well settled maxim of English law, that men may be insolvent without being bankrupts, and become bankrupts without being insolvent; for while it would declare that insolvency shall of itself constitute bankruptcy, the absence of any other provisions in the act authorizing proceedings against partners jointly, would leave it at least doubtful whether partners in trade could be jointly decreed bankrupts on the petition of a creditor, on any other ground than that of insolvency. It is obvious, I think, that the execution of the act under such a construction would be attended with numerous and very serious embarrassments. What is to be considered as constituting insolvency in the sense here intended? Is a mercantile firm to be adjudged to have "become insolvent" upon its first failure, and under whatever circumstances, to meet its pecuniary engagements? Few, I imagine, could be found who would assert the reasonableness of such a rule. Is it to be pronounced insolvent whenever its assets are insufficient to discharge all its liabilities, however small may be the deficiency? If so, how is this fact to be ascertained? It would be easy, but it is unnecesary to illustrate the pertinency and force of these questions. Such a construction of this section would also involve what seems to me a striking inconsistency; for if it is just and expedient that partners in trade should be liable to be decreed bankrupts, in invitum, on the ground of insolvency alone, why should not individual traders be subject to the same liability? This construction, as already observed, is suggested by the literal import of the phrase "become insolvent;" and it may, I think, be added, that this is the only circumstance by which such a construction is recommended. But if these words are to receive a literal interpretation, I see not why the residue of the clause in which they occur ought not also to receive a like construction; and then it would follow that any insolvent mercantile firm might be decreed bankrupt on the application of any creditor, without regard to the amount of the indebtedness of such firm, or to the amount of the debt owing to the petitioning creditor; for the clause in question contains no limitation whatever, with regard to either of these points. Are we then to conclude that this further innovation and inconsistency were intended? Then again, it declares that in the cases embraced by it, "an order may be made in the manner provided in this act." What order is here meant? To determine this point, resort must be had to the antecedent parts of the act. But the act says

nothing of any "order" adapted to the case. It provides for the granting and entering of decrees of bankruptcy; but these decrees are, I believe, nowhere called orders—while the act does speak of making orders for other purposes. I presume, however, that the phrase "an order may be made," was intended to import that a decree of bankruptcy might be entered. This criticism will serve to show the generality and looseness which characterize the language of this whole provision.

This act is universally admitted to be highly obscure, and much of its obscurity seems to me to have been caused by an attempt to embrace the two descriptions of cases for which it provides, by the same forms of language, instead of keeping them separate, and adapting the phraseology to each, without regard to the other; and the clause under consideration presents, I think, an example of the truth of this remark. Its terms, it will be seen, are perfectly suited to cases of voluntary application. These are all founded on the admitted insolvency of the applicant. It is important to remark, also, that there is abundant scope for the operation of this provision even in regard to compulsory cases, without giving to it the literal construction in question, because the antecedent provisions of the act relate, in terms, only to individual bankrupts, and this provision was proper for the purpose of authorizing proceedings under the act against partners. The clause in question, under this view of its object, forms a natural and proper introduction to the important and more happily expressed provisions which follow, concerning the duties of assignees and the mode of distributing the estates of bankrupt partners. I consider the last provision of this section, moreover, as militating strongly against a literal construction of the first clause. It declares that "in all other respects," (i. e. except as to the duties of the assignee and the mode of distribution,) "the proceedings against partners shall be conducted in like manner as if they had been commenced and prosecuted against one person alone." This provision, it appears to me, goes far towards an express adoption of all the conditions and limitations prescribed by the act relative to individual cases. Upon the whole, therefore, I am of opinion that in respect to compulsory applications, the phrase "become insolvent" in the first part of the fourteenth section of the bankrupt act, is to be interpreted as equivalent to the phrase "shall commit any act of bankruptcy." I am aware that this decision may excite some surprise; but it is the result of mature reflection, and I fully believe it to be sound. This petition must accordingly be dismissed, with costs.